FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

R.J. REYNOLDS TOBACCO COMPANY;
AMERICAN SNUFF COMPANY; SANTA
FE NATURAL TOBACCO COMPANY,
INC.,

*Plaintiffs-Appellants*,

v.

COUNTY OF LOS ANGELES; COUNTY
OF LOS ANGELES BOARD OF
SUPERVISORS; HILDA L. SOLIS;
MARK RIDLEY-THOMAS; SHEILA
KUEHL; JANICE HAHN; KATHRYN
BARGER, each in his or her official
capacity as a member of the Board
of Supervisors,

*Defendants-Appellees*.

No. 20-55930

D.C. No.
2:20-cv-04880-
DSF-KS

OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted October 19, 2021
Pasadena, California

Filed March 18, 2022

Before:  Ryan D. Nelson and Lawrence VanDyke, Circuit Judges, and Karen E. Schreier,\* District Judge.

Opinion by Judge VanDyke;
Dissent by Judge Nelson

## SUMMARY\*\*

### Preemption / Tobacco Control Act

The panel affirmed the district court's dismissal of an action brought by tobacco companies, alleging that the Family Smoking Prevention and Tobacco Control Act ("TCA") preempts the County of Los Angeles's ban on the sale of all flavored tobacco products.

The panel held that the TCA authorizes the Food and Drug Administration to regulate tobacco products and expressly preempts some contrary state or local regulations, while also expressly preserving and saving from preemption other state and local regulatory authority over tobacco.  The panel held that the TCA's text, framework, and historical context reveal that it carefully balances federal and local power by carving out the federal government's sole authority to establish the standards for tobacco products, while preserving state, local, and tribal authority to regulate or ban altogether sales of some or all tobacco products.

---

\* The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota, sitting by designation.

\*\* This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel wrote that the TCA's "unique tripartite preemption structure" governed its analysis.  The TCA includes a "preservation clause," which preserves state, local, and tribal power to enact any regulation concerning tobacco products that is "in addition to or more stringent" than those promulgated by the TCA.  The TCA's preemption clause reads as follows:  "No . . . political subdivision of a State may establish or continue in effect with respect to a tobacco product any requirement which is different from, or in addition to, any requirement under the provisions of [the TCA] relating to tobacco product standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products."   An immediately following savings clause instructs that the preemption clause "does not apply to requirements relating to the sale, distribution, possession, information reporting to the State, exposure to, access to, the advertising and promotion of, or use of, tobacco products by individuals of any age, or relating to fire safety standards for tobacco products."

The panel held that, properly understood, the TCA's preemption clause does not preclude non-federal sales regulations such as the County's sales ban.  But even if it did, the County's sales ban would nonetheless be exempted from preemption because it falls within that clause's text as an allowed local requirement relating to the sale of tobacco products.  Either way, the TCA does not expressly preempt the County's sales ban.  The panel also held that, because the TCA explicitly preserves local authority to enact more stringent regulations than the TCA, the County's sales ban does not pose an impermissible obstacle to the TCA's purposes or objectives regarding flavored tobacco. Accordingly, the County's sales ban is neither expressly nor impliedly preempted.

Dissenting, Judge R. Nelson wrote that because Los Angeles's ban falls within the TCA's preemption clause and is neither preserved nor saved, he would hold that it is expressly preempted. Judge R. Nelson wrote that the ban fell within the preemption clause because it was a requirement different from or in addition to any TCA requirement relating to tobacco product standards, which can relate both to manufacturing and to sales. Judge R. Nelson wrote that, by its terms, the preservation clause does not apply to the preemption clause, but rather clarifies that no other provision of the statute has any preemptive effect and that the authorities of federal agencies and Indian tribes are not preempted by the TCA. Finally, Judge R. Nelson would hold that the savings clause only saves for states the authority to enact age requirements.

## COUNSEL

Noel J. Francisco (argued), Christian G. Vergonis, Ryan J. Watson, and Andrew J. M. Bentz, Jones Day, Washington, D.C.; Jason C. Wright, Jones Day, Los Angeles, California; for Plaintiffs-Appellants.

Kent R. Raygor (argued) and Valerie E. Adler, Sheppard Mullin Richter & Hampton LLP, Los Angeles, California, for Defendants-Appellees.

Cory L. Andrews and John M. Masslon II, Washington Legal Foundation, Washington, D.C., for Amicus Curiae Washington Legal Foundation.

Rob Bonta, Attorney General; Renu R. George, Senior Assistant Attorney General, Nicholas M. Wellington and James V. Hart, Supervising Deputy Attorneys General; Peter

F. Nascenzi, Deputy Attorney General; Office of the Attorney General, Sacramento, California; for Amicus Curiae State of California.

Jordan Raphael, Byron Raphael LLP, Los Angeles, California; Dennis A. Henigan, Campaign for Tobacco-Free Kids, Washington, D.C.; for Amici Curiae Public Health and Medical Organizations.

Rachel Bloomekatz, Columbus, Ohio, for Amici Curiae Public Health Law Center, Action on Smoking and Health, California State Association of Counties, ChangeLab Solutions, International City/County Management Association, International Municipal Lawyers Association, Legal Resource Center for Public Health Policy, National Association of Counties, National League of Cities, Public Health Advocacy Institute, and U.S. Conference of Mayors.

**OPINION**

VANDYKE, Circuit Judge:

## I.  INTRODUCTION

Until just over a decade ago, tobacco products were regulated almost exclusively by the states and local governments, with little federal involvement.  Then beginning in the late 1990's, the U.S. Food and Drug Administration first sought to exert federal regulatory authority over such products.  This initial attempt was swiftly rebuffed by the Supreme Court, which concluded the FDA lacked that authority under then-existing statutes. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 126 (2000).  In response, Congress passed the Family Smoking Prevention and Tobacco Control Act ("TCA"), Pub. L. No. 111–31, 123 Stat. 1776 (2009), *codified at* 21 U.S.C. § 387 *et seq.*, which authorized the FDA to regulate tobacco products and expressly preempted some contrary state or local regulations, while also expressly preserving and saving from preemption other state and local regulatory authority over tobacco.

The boundary between the TCA's preemption clause and its preservation and savings clauses is the subject of the dispute in this case.  The County of Los Angeles claims that the TCA's preservation and savings clauses permit its decision to ban the sale of all flavored tobacco products.  Predictably, multiple tobacco companies have challenged the County's ban, arguing that the TCA's preemption clause both expressly and impliedly preempts the ban.

The TCA's unique tripartite preemption structure governs our analysis of these issues.  Its text, framework, and historical context reveal that it carefully balances federal and

local power by carving out the federal government's sole authority to *establish* the standards for tobacco products, while preserving state, local, and tribal authority to regulate or ban altogether sales of some or all tobacco products. Properly understood, the TCA's preemption clause does not preclude non-federal sales regulations such as the County's sales ban challenged in this case. But even if it did, the County's sales ban would nonetheless be exempted from preemption by the TCA's savings clause because it easily falls within that clause's text as an allowed local "requirement[] relating to the sale . . . of[] tobacco products." 21 U.S.C. § 387p(a)(2)(B). Either way, the TCA does not expressly preempt the County's sales ban. And given that the TCA explicitly preserves local authority to enact "more stringent" regulations than the TCA, the County's sales ban does not pose an impermissible obstacle to the TCA's purposes or objectives regarding flavored tobacco. It is therefore neither expressly nor impliedly preempted, and we affirm the district court.

## II. BACKGROUND

### 1. States and Localities Historically Possessed Broad Power to Regulate and Ban Tobacco Products.

The TCA's tripartite preemption provision can be properly understood only against the historical backdrop of states and localities' longstanding role as the primary regulators of tobacco products. *See Stewart v. Dutra Const. Co.*, 543 U.S. 481, 487 (2005) (interpreting a federal statute by looking to the "backdrop against which Congress" acted). Over a century ago, the Supreme Court first recognized that states, because of public health concerns, could prohibit the sale of cigarettes. *See Austin v. State of Tennessee*, 179 U.S. 343, 348–49 (1900) ("[W]e think it within the province of the legislature to say how far [cigarettes] may be sold, or to

prohibit their sale entirely . . . provided no discrimination be used . . . and there be no reason to doubt that the act in question is designed for the protection of the public health."). In the intervening century, and in response to growing awareness of the harmful effects of cigarettes, Congress enacted various statutory provisions focusing on consumer education through advertising and labeling requirements. *See, e.g.*, Federal Cigarette Labeling and Advertising Act ("FCLAA"), Pub. L. No. 89–92, 79 Stat. 282 (1965) (codified as amended at 15 U.S.C. §§ 1331–1341), *see also Graham v. R.J. Reynolds Tobacco Co.,* 857 F.3d 1169, 1186–87 (11th Cir. 2017) (en banc) (surveying the development of federal tobacco laws).[1] But these federal statutes never preempted state and localities' traditional power to restrict or ban sales of tobacco products. *See id.*

During this period, states also played key roles in indirectly regulating tobacco products through litigation. In the 1990s, after numerous heads of major tobacco companies denied under oath the addictiveness of nicotine, several

---

[1] *See also* Public Health Cigarette Smoking Act of 1969, Pub. L. No. 91–222, 84 Stat. 87; Alcohol and Drug Abuse Amendments of 1983, Pub. L. No. 98–24, 97 Stat. 175; Comprehensive Smoking Education Act of 1984, Pub. L. No. 98–474, 98 Stat. 2200 (1984); Comprehensive Smokeless Tobacco Health Education Act of 1986, Pub. L. No. 99–252, 100 Stat. 30. While "the ADAMHA Reorganization Act, Pub. L. No. 102-321, 106 Stat. 323 (1992), condition[ed] certain block grants on states making it unlawful for any manufacturer, retailer, or distributor of tobacco products to sell or distribute any such product to any individual under the age of 18," *Graham*, 857 F.3d at 1187 (citation and internal quotation marks omitted), the strings attached to federal grants did not preempt state or local authority from regulating the sale or ban of these products; quite the opposite, they strongly incentivized states to exercise their traditional authority over tobacco-related sales. *See* 42 U.S.C. § 300x-26.

states sued their companies.  *See Regulation of Tobacco Products (Part 1): Hearings Before the Subcomm. on Health & the Env't*, 103d Cong. 628 (1994); Barry Meier, *Remaining States Approve the Pact on Tobacco Suits*, N.Y. TIMES, Nov. 21, 1998, at A1.  The lawsuits resulted in a "landmark agreement" between the tobacco companies and the states, where the companies agreed to monetary payments and permanent injunctive relief.  *See Lorillard Tobacco v. Reilly*, 533 U.S. 525, 533 (2001).

Meanwhile, states continued to enact laws regulating the sale and use of cigarettes and tobacco products, including imposing numerous restrictions on tobacco sales.[2]  These restrictions included, for example, prohibitions on sales of tobacco products in vending machines and near schools.  *See* Paul A. Diller, *Why Do Cities Innovate in Public Health? Implications of Scale and Structure*, 91 Wash. U. L. Rev 1219, 1231–35 (2014) (discussing state and local bans of flavored cigarettes passed before the TCA).  Some localities even banned sales of cigarettes and vape products entirely from retail stores.  *See, e.g.*, Manhattan Beach, Cal., Ordinance 20-0007.  Because the FDA lacked authority to regulate tobacco products until Congress enacted the TCA

---

[2] *See, e.g.*, Stop Tobacco Access to Kids Enforcement ("STAKE") Act, 1994 Cal. Stat. 1009 (codified at Cal. Bus. & Prof. Code §§ 22950–64) (including mandates such as "no cigarette or tobacco product shall be sold, offered for sale, or distributed from a vending machine or appliance, or any other coin or token operated mechanical device designed or used for vending purposes, *id.* § 22960(a)); *see also* Cigarette and Tobacco Products Licensing Act of 2003 (codified at Cal. Bus. & Prof. Code §§ 22970–22995) (requiring licensing throughout the distribution chain from manufacturer to retailer); Cal. Rev. & Tax. Code §§ 30131–30131.6 (significantly increasing the state's cigarette and tobacco taxes to fund, in part, anti-smoking efforts).

in 2009,[3] the history of tobacco regulation is, until recently, one of state and local action.

## 2. The TCA Continued to Preserve State and Local Power Over Tobacco Sales.

Given this extensive background of state and local tobacco regulation, it would have been surprising if Congress had broadly jettisoned the longstanding tradition of states and localities' role in the regulation of sales of tobacco products when it enacted the TCA in 2009. The text of the TCA itself demonstrates that it did not. Instead, Congress made an "explicit decision to preserve for the states a robust role in regulating, and even banning, sales of tobacco products." *U.S. Smokeless Tobacco Mfg. Co. v. City of New York*, 708 F.3d 428, 436 (2d Cir. 2013).

Specifically, the TCA sought to "authorize the [FDA] to set national standards controlling the *manufacture* of tobacco products and the identity, public disclosure, and amount of *ingredients used* in such products." Pub. L. No. 111-31, 123 Stat. 1778 (2009) (emphasis added). In doing so, the TCA balances state and federal power over tobacco regulation by way of a unique three-layered preservation provision.[4] The first clause of the provision, labeled the

---

[3] *See R.J. Reynolds Tobacco Co. v. City of Edina*, 482 F. Supp. 3d 875, 880–81 (D. Minn. 2020) (observing that the TCA "was partly a response to the FDA's earlier unsuccessful attempt to assert jurisdiction over tobacco products in order to enact age-specific tobacco regulations" (citing *Brown & Williamson Tobacco Corp.*, 529 U.S. at 125–26)); *see also U.S. Smokeless Tobacco Mfg. Co. v. City of New York*, 703 F. Supp. 2d 329, 336 (S.D.N.Y. 2010) (same).

[4] Because this is a case about preemption, it is easy to refer to 21 U.S.C. § 387p of the TCA as a "preemption provision." But it is more

preservation clause, broadly preserves state, local, and tribal power to enact *any* regulation concerning tobacco products that is "in addition to or more stringent" than those promulgated by the TCA:

> Except as provided in [the preemption clause], nothing in this subchapter, or rules promulgated under this subchapter, shall be construed to limit the authority of a . . . political subdivision of a State . . . to enact, adopt, promulgate, and enforce *any* law, rule, regulation, or other measure with respect to tobacco products that is in addition to, or more stringent than, requirements established under this subchapter, including a law, rule, regulation, or other measure *relating to or prohibiting the sale*, distribution, possession, exposure to, access to, advertising and promotion of, or use *of tobacco products by individuals of any age*, information reporting to the State, or measures relating to fire safety standards for tobacco products. No provision of this subchapter shall limit or otherwise

---

properly characterized as a "*preservation* provision." While § 387p does contain the preemption clause that forms the basis of Appellants' challenge to the County's ban (*see id.* § 387p(a)(2)(A)), that preemption clause is sandwiched between two clauses that expressly preserve and exempt from preemption broad non-federal regulatory authority over tobacco products (*see id.* §§ 387p(a)(1), (a)(2)(B)). Indeed, even the title of § 387p ("Preservation of State and Local Authority") evinces its predominant purpose to *preserve* rather than *preempt* non-federal regulatory authority. This overall structure of the TCA's "preservation provision" cannot be overemphasized, and as discussed further below, distinguishes the TCA's preemption clause from dissimilar provisions in other federal statutes considered by the Supreme Court.

> affect any State, tribal, or local taxation of
> tobacco products.

21 U.S.C. § 387p(a)(1) (emphasis added).  Of particular
relevance here, the TCA expressly reserves localities' ability
to enact any regulations "relating to or prohibiting the sale
. . . or use of tobacco products by individuals of any age."
*Id.*[5]

The TCA then immediately follows its broad
preservation clause with a preemption clause that expressly
overrides the preservation clause in the case of any conflict
between the two provision's terms.  The preemption clause
reads:

> No . . . political subdivision of a State may
> establish or continue in effect with respect to
> a tobacco product any requirement which is
> different from, or in addition to, any
> requirement under the provisions of this

---

[5] There is a scrivener's error in both the TCA's preservation and
savings clauses.  Both clauses contain similar statements allowing non-
federal laws "relating to or prohibiting the sale . . . or use of tobacco
products *by* individuals of any age."  *Id.* § 387p(a)(1) (emphasis added);
*see also id.* § 387p(a)(2)(B) (similar).  The drafters of these clauses used
the preposition "by" in the last prepositional phrase "by individuals of
any age," presumably because the preposition "by" matches the closest
object ("use") in the preceding series of objects (thus, "use . . . by
individuals of any age").  But while the preposition "by" makes sense for
some of the other objects in the series (e.g., "possession . . . by
individuals of any age"), it doesn't make sense for others, such as "sale"
(it should be "sale . . . [*to*] individuals of any age") or "advertising and
promotion" ("advertising and promotion . . . [*to*] individuals of any
age").  Correcting for this drafting error, we replace the word "by" with
a bracketed "[to]" in subsequent quotations in this opinion where
appropriate.

> subchapter *relating to tobacco product standards*, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products.

*Id.* § 387p(a)(2)(A) (emphasis added). While the TCA does not explicitly define "tobacco product standards," it uses that phrase elsewhere in the TCA when referring to various characteristics of tobacco products, such as "the construction, components, ingredients, additives, constituents . . . and properties of the tobacco products" (among other references). *See id.* § 387g(a)(4)(B)(i). It also uses the phrase broadly as encompassing some federal "sale and distribution . . . restrict[ions]," *id.* § 387g(a)(4)(B)(v)— including the federal ban on most flavored cigarettes, *id.* § 387g(a)(1)(A)—as well as tobacco labeling requirements. *Id.* § 387g(a)(4)(C).

Immediately following the TCA's preemption clause, a savings clause then excepts various broadly defined categories from preemption. *See id.* § 387p(a)(2)(B). Specifically, the savings clause instructs that the preemption clause

> does not apply to requirements relating to the sale, distribution, possession, information reporting to the State, exposure to, access to, the advertising and promotion of, or use of, tobacco products by individuals of any age, or relating to fire safety standards for tobacco products.

*Id.* § 387p(a)(2)(B).

**3. Los Angeles County Banned the Sale of Flavored Tobacco Products.**

In September 2019, as part of amendments to its business licenses and health and safety code, Los Angeles County joined at least three states and over 300 local jurisdictions across the country by enacting a prohibition on the sale of flavored tobacco products.  The County's ordinance reads:

> [I]t shall be a violation of this Chapter for a tobacco retailer/licensee or its agent(s) or employee(s) to sell or offer for sale, or to possess with the intent to sell or offer for sale, any flavored tobacco product or any component, part, or accessory intended to impart, or imparting a characterizing flavor in any form, to any tobacco product or nicotine delivery device, including electronic smoking devices.

LOS ANGELES COUNTY, CAL., CODE § 11.35.070(E) (2019); see also CTFK, Fact Sheet (Oct. 23, 2020), https://perma.cc/JGX3-3VZP.  The ordinance defines "flavored tobacco product" as "any tobacco product, as defined in this Chapter, which imparts a characterizing flavor."  Id.  § 11.35.020(J).  It further defines "characterizing flavor" as "a taste or aroma, other than the taste or aroma of tobacco, imparted either prior to or during consumption of a tobacco product."  Id. § 11.35.020(C).  The ordinance therefore only permits the sale of tobacco products with either the taste or aroma of tobacco, or no taste or aroma at all.  See id.

### 4. The District Court Dismissed Appellants' Case.

Appellants R.J. Reynolds Tobacco Company, American Snuff Company, LLC, and Santa Fe Natural Tobacco Company, Inc. (Appellants) sued the County of Los Angeles and various County officials (Appellees), alleging that the TCA expressly and impliedly preempts the County's ordinance. The district court first denied Appellants' motion for a preliminary injunction, finding that they were not likely to succeed on the merits of their claims. It then subsequently granted Appellees' Rule 12(b)(6) motion, incorporating the reasoning from its denial of the preliminary injunction. It also denied Appellants' motion for summary judgment as moot. Judgment was later entered, and Appellants appeal that judgment.

## III. JURISDICTION AND STANDARD OF REVIEW

"We have appellate jurisdiction under 28 U.S.C. § 1291." *Kashem v. Barr*, 941 F.3d 358, 369 (9th Cir. 2019). "A dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is reviewed *de novo*." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). "We [also] review *de novo* a district court's application of preemption principles." *U.S. Smokeless Tobacco Mfg. Co.*, 708 F.3d at 432 (citation omitted).

## IV. DISCUSSION

"The Supremacy Clause provides that the laws of the United States 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Gonzalez v. Arizona*, 677 F.3d 383, 391–92 (9th Cir. 2012) (en banc) (quoting U.S. Const. art. VI, cl. 2). "Under our system of dual sovereignty, courts deciding whether a particular state law is preempted under

the Supremacy Clause must strive to maintain the delicate balance between the States and the Federal Government, especially when Congress is regulating in an area traditionally occupied by the States."  *Id.* (citations and internal quotation marks omitted).

The TCA's text, framework, and historical context reflect its attempt to strike such a balance.  Its unique preemption structure gives the federal government exclusive power to set "tobacco product standards," while preserving state, local, and tribal authority to regulate or ban sales of those products altogether.  Consistent with this structure, it would be a mistake to read "tobacco product standards" in the TCA's preemption clause so broadly as to encompass the type of sales ban challenged in this case—particularly since the TCA both expressly preserves and exempts from preemption local authority over that exact type of regulation. The preemption clause therefore does not cover the County's sales ban.  But even if it did, the savings clause "saves" it from preemption because a sales ban qualifies as a "requirement[] relating to the sale" of tobacco products.

We therefore hold that TCA does not expressly preempt the County's sales ban.  And given that Congress explicitly preserved local authority to enact the very type of sales ban at issue here, we also reject Appellants' claim of implied preemption.

## 1. The TCA Does Not Expressly Preempt the County's Sales Ban.

The TCA's text, structure, and historical context precludes express preemption in this case.  "Where, as here, Congress has specifically addressed the preemption issue, our task is primarily one of interpreting what Congress has

said on the subject." *U.S. Smokeless Tobacco Mfg. Co.*, 708 F.3d at 432.**[6]**

We "begin with the wording of [the TCA's preemption provision], but we must also consider the statute as a whole to determine whether the local ordinance actually conflicts with the overall federal regulatory scheme." *Id.* (citation omitted); *see also Brown & Williamson Tobacco Corp.*, 529 U.S. at 133 ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (citation and internal quotation marks omitted)). In interpreting statutes wholistically, we must strive to

---

**[6]** The parties dispute whether a presumption against preemption applies, but the Supreme Court has already determined that if a "statute contains an express pre-emption clause, we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin California Tax-Free Tr.* (*Franklin*), 579 U.S. 115, 125 (2016) (citation and internal quotation marks omitted); *see also Int'l Bhd. of Teamsters, Loc. 2785 v. Fed. Motor Carrier Safety Admin.*, 986 F.3d 841, 853 (9th Cir. 2021) (relying on *Franklin* in determining that the existence of an express presumption clause negated any presumption against preemption); *Atay v. Cty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (same). Appellees argue that these cases suggest that only *unambiguous* express preemption clauses override the presumption. But this runs counter to *Franklin*, where the majority and dissent's debate over the scope of the preemption clause at issue in that case demonstrates that it was not, in fact, unambiguous. *See* 579 U.S. at 135–37 (Sotomayor, J., dissenting). Appellees also rely on two post-*Franklin* cases from our court that rely on the presumption of preemption when evaluating an express preemption clause. *See Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016, 1021 (9th Cir. 2020); *California Ins. Guarantee Ass'n v. Azar*, 940 F.3d 1061, 1067 (9th Cir. 2019). But the parties in both of those cases failed to address *Franklin*. Pursuant to *Franklin* and our court's application of *Franklin*, therefore, our focus is on the meaning of the TCA's text without any presumptive thumb on the scale.

"giv[e] effect to each word and mak[e] every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Shelby v. Bartlett*, 391 F.3d 1061, 1064 (9th Cir. 2004) (citation omitted).  We also "assum[e] that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (citation omitted).

### a. *The Preemption Clause Doesn't Cover the County's Sales Ban.*

Applying these well-established principles, we first conclude that the phrase "tobacco product standards" in the TCA's preemption clause does not encompass the County's sales ban.

We begin with the text of all three adjacent clauses—preservation, preemption, and savings—considered together.  In § 387p of the TCA, the initial preservation clause broadly preserves state, local, and tribal authority to enact a variety of regulations that are "in addition to, or more stringent than" the TCA's requirements.  *See* 21 U.S.C. § 387p(a)(1).  While under the TCA the federal government sets the regulatory floor, the plain text of the preservation clause allows state, local, and tribal governments to go beyond that, including even "*prohibiting the sale* . . . of tobacco products [to] individuals of any age." *Id.* (emphasis added).

The subsequent preemption clause then carves out eight limited exceptions to the preservation clause, each of which relates most obviously to the production or marketing stages—and not the retail sale—of tobacco products: "tobacco product standards, premarket review, adulteration,

misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products." *Id.* § 387p(a)(2)(A).   For example, the TCA describes "adulteration" in terms of various issues that could arise during the manufacturing or marketing stages. *See id.* § 387b. Similarly, "registration" requires that "every person who owns or operates any establishment in any State engaged in the *manufacture, preparation, compounding, or processing* of a tobacco product or tobacco products shall register with the Secretary the name, places of business, and all such establishments of that person." *Id.* § 387e(b) (emphasis added).   And to qualify as a "modified risk tobacco product," details about the manufacturing and marketing processes must be provided. *See id.* § 387k(d).

While the TCA does not explicitly define "tobacco product standards," it describes that phrase in terms of the manufacturing and marketing stages.   *See e.g.*, § 387g(a)(4)(B)(i) (requiring tobacco product standards to include, where appropriate, "provisions respecting the construction, components, ingredients, additives, constituents, including smoke constituents, and properties of the tobacco product").   Consistent with its surrounding categories, it makes sense to view "tobacco product standards" in the TCA's preemption clause as most naturally referring to standards pertaining to the production or marketing stages up until the actual point of sale. *See Rizo v. Yovino*, 950 F.3d 1217, 1224 (9th Cir. 2020) (en banc) (noting the "well-settled rule[] of statutory construction" that "words grouped together should be given similar or related meaning to avoid giving unintended breadth to the Acts of Congress" (citation and internal quotation marks omitted)).

This is not to say that the phrase "tobacco product standards" is incapable of being read more broadly.   Since

the phrase is not defined by the TCA, it could in theory conceivably encompass essentially anything and everything related to tobacco products that might influence how they are produced.  For example, "tobacco product standards" could encompass "labeling," since how tobacco products must be labeled will, no doubt, affect how they are produced.  Indeed, as noted above, the TCA itself "include[s]" labeling under the "tobacco product standards" that the FDA is elsewhere empowered to regulate.  *See id.* § 387g(a)(4)(C).

But reading "tobacco product standards" in the preemption clause so capaciously runs immediately into several textual problems.  First, the preemption clause itself lists "labeling" as a separate preempted category, which would be redundant if "tobacco product standards" in that same clause was meant to have its broadest possible interpretation.

Second, reading "tobacco product standards" as covering any non-federal regulations that even *indirectly* affect such standards would render much of the preceding preservation clause a nullity.  Every state or local regulation "relating to or prohibiting the sale . . . of tobacco products" (preservation clause) can be said to "relate to tobacco product standards" (preemption clause) in *some* indirect way.  If Congress had meant to broadly preempt all such state and local sales regulations or bans via the ambiguous "tobacco product standards" language in the preemption clause, why would it have "preserved" to states and localities that authority in the very proceeding provision?  In short, reading "tobacco product standards" in the TCA's preemption clause broadly creates superfluity problems in *both* the TCA's preemption clause and its preservation clause, whereas reading "tobacco product standards" in the preemption clause more narrowly avoids these interpretive problems.

The savings clause immediately follows the preemption clause and "except[s]" broad categories from preemption, including "requirements relating to the sale . . . of[] tobacco products [to] individuals of any age." *Id.* § 387p(a)(2)(B). In doing so, the TCA reinforces what it first established in the preservation clause: that the regulation and prohibition of tobacco product sales falls squarely within the purview of states, localities, and tribal entities. The savings clause also solidifies the narrower interpretation of "tobacco product standards" discussed above. If "tobacco product standards" was to be interpreted as broadly encompassing (and therefore preempting) states and localities' laws "relating to or prohibiting the sale" of tobacco products, then one must assume that Congress (1) included a superfluous "preservation" of states and localities' ability to regulate sales, while simultaneously (2) taking away their ability to do just that in the preemption clause, while also simultaneously (3) giving back their ability to do just that in the savings clause when it broadly "except[ed]" from the preemption clause any state or local "requirements relating to the sale" of tobacco products. That tortured path is avoided only by reading the preemption clause's "tobacco product standards" as not reaching state and local sales bans.

In short, the TCA's text sandwiches limited production and marketing categories of preemption between clauses broadly preserving and saving local authority, including any "requirements relating to the sale" of tobacco products. This unique "preservation sandwich" enveloping the TCA's preemption clause reveals a careful balance of power between federal authority and state, local, and tribal authority, whereby Congress has allowed the federal government to set the standards regarding how a product would be manufactured and marketed, but has left states, localities, and tribal entities the ability to restrict or opt out

of that market altogether.  We are not alone in reaching this interpretation of the TCA's unique preemption structure: when evaluating whether the TCA preempted a local ordinance prohibiting the sale of flavored tobacco products except in tobacco bars, the Second Circuit similarly determined that the TCA's preemption provision "distinguishes between manufacturing and the retail sale of finished products; it reserves regulation at the manufacturing stage exclusively to the federal government, but allows states and localities to continue to regulate sales and other consumer-related aspects of the industry in the absence of conflicting federal regulation."  *U.S. Smokeless Tobacco Mfg. Co.*, 708 F.3d at 434.

This interpretation is consistent with the historical "backdrop against which Congress" acted in enacting the TCA.  *See Stewart*, 543 U.S. at 487.  As previously noted, the states and localities have historically played a primary role in regulating the sale of tobacco products.  And after the Supreme Court over a century ago explicitly ruled that states have the power to opt out of the tobacco product market, none of the subsequent federal enactments have stripped localities of this power.  The TCA effectively *carves out* federal power from a historical body of state and local authority by setting the floor for production and marketing standards, while still preserving states and localities' broad power over regulation of the sales of those products.  The County's sales ban fits comfortably within the historical authority of states, localities, and tribal entities that Congress clearly preserved in the TCA's preservation sandwich.

Appellants' arguments to the contrary are unpersuasive. The crux of Appellants' argument is that the County's sales ban qualifies as the "paradigmatic tobacco product standard" and therefore falls under the preemption clause.  But not only

does this interpretation contravene the TCA's text, framework, and historical context for the reasons just articulated, it also nullifies key aspects of the preservation clause and undermines the commonly understood meaning of the phrase "product standard."

First, as already discussed, interpreting "tobacco product standards" to encompass the County's sales ban at issue here renders meaningless the preservation clause's "preservation" of localities' authority to "prohibit sales." Under Appellants' broad interpretation of "tobacco product standards," it is hard to imagine any sales prohibition— which the preservation clause expressly preserves—that would *not* be preempted under the preemption clause. It is unlikely that Congress would purport to preserve something for state and local authority, only to preempt it in the very next provision. "Such a broad reading of the preemption clause, which collapses the distinction between sales and product regulations, would render superfluous [the preservation statute]'s three-part structure, and in particular would vitiate the preservation clause's instruction that the [TCA] not be 'construed to limit the authority of a State or political subdivision of a State to enact and enforce any measure prohibiting the sale of tobacco products.'" *U.S. Smokeless Tobacco Mfg. Co.*, 708 F.3d at 434 (quoting 21 U.S.C. § 387p(a)(1)) (alteration marks omitted). "Because statutes should be construed, if possible, to give effect to every clause and word," we agree with our sister circuit and "adopt a narrower reading of the preemption clause that also gives effect to the preservation clause." *Id.* (internal citations and alterations omitted).

Second, Appellants' interpretation unnecessarily trades the most common and natural understanding of "product standards" for the broadest interpretation possible. While

there can be a relationship between product standards and sales bans, we must not lose sight that they are, in fact, different things.  A total ban on all tobacco products would not naturally be characterized as merely a "tobacco product standard."  *Compare Ban*, Merriam-Webster's Dictionary Online, https://www.merriam-webster.com/dictionary/ban (last visited Dec. 26, 2021) ("to prohibit especially by legal means"), *with Standard*, Merriam-Webster's Dictionary Online, https://www.merriam-webster.com/dictionary/standard (last visited Dec. 26, 2021) ("a level of quality, achievement, etc. that is considered acceptable or desirable"); *see also United States v. Carter*, 421 F.3d 909, 911 (9th Cir. 2005) ("[A] fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." (citation and internal quotation marks omitted)); *United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 689 (9th Cir. 2006) (recognizing "the common practice of consulting dictionary definitions to clarify [statutory terms'] ordinary meaning" (citation omitted)).  While regulations regarding the length or diameter of a cigarette are easily considered a "product standard," for example, *banning* the sale of cigarettes over a certain length or diameter is just as obviously not *directly* a regulation of a tobacco product standard.  It is merely banning the sale of a certain type of tobacco product, not dictating how that product must be produced.

It is true that the Supreme Court has repeatedly found that a state or local sales ban *can* run afoul of the preemptive force of a federal product standard, because in some cases the sales ban undermined the federal standards protected by broad federal preemption clauses.  *See Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455 (2012); *Engine Mfrs. Ass'n*,

541 U.S. 246, 252 (2004).  Appellants lean heavily on these two cases, arguing that the County's sales ban is similarly doomed by the TCA's preemption of state or local tobacco product standards.  But neither *National Meat* nor *Engine Manufacturers* considered anything like the preservation sandwich included in the TCA.

In *National Meat*, the Supreme Court held that the Federal Meat Inspection Act (FMIA), which "regulates the inspection, handling, and slaughter of livestock for human consumption," expressly preempted a California law that prohibited the buying or selling of nonambulatory animals (i.e., animals that cannot walk).  565 U.S. at 455, 458–59.[7] In doing so, the Court emphasized that "[t]he FMIA's preemption clause sweeps widely."  *Id.* at 459.  It therefore rejected the respondent's attempted distinction between sales bans and the meat production process.  Instead, the Court reasoned that "the sales ban . . . functions as a command to slaughterhouses to structure their operations in the exact way the remainder of [the California law] mandates."  *Id.* at 464.  "[I]f the sales ban were to avoid the FMIA's preemption clause," it explained, "then any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved.  That would make a mockery of the FMIA's preemption provision."  *Id.*  Notably, nothing in the FMIA's preemption provision expressly preserved or saved states or localities' authority to regulate sales.  *See*

---

[7] While the FMIA's preemption provision included a savings clause, this clause did not save states' ability to regulate sales.  *See id.* at 458 n.3 ("The preemption provision also includes a saving clause, which states that the Act 'shall not preclude any State . . . from making requirement[s] or taking other action, consistent with this [Act], with respect to any other matters regulated under this [Act].'" (quoting 21 U.S.C. § 678)).

21 U.S.C. § 678.   And whereas the Supreme Court in *National Meat* saw no distinction between a sales ban and the production process in *that* case, in this case Congress has statutorily recognized precisely that distinction when it expressly preempted non-federal "tobacco product standards," while in the same statutory section expressly preserved and exempted from preemption state and local "requirements relating to . . . sale[s]."

Like it did in *National Meat*, the Supreme Court also rejected an attempted distinction between general production processes and sales bans when interpreting the Clean Air Act (CAA)'s preemption provision in *Engine Manufacturers*.   541 U.S. at 253–55.   The CAA's preemption provision provided that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part."  541 U.S. at 252 (quoting 42 U.S.C. § 7543(a)).  The local regulation challenged in *Engine Manufacturers* "prohibit[ed] the purchase or lease by various public and private fleet operators of vehicles that do not comply with stringent emission requirements."  *Id.* at 248.  The respondents argued that the CAA's preemption provision's reference to "standards" only referred to "a *production* mandate that requires *manufacturers* to ensure that the vehicles they produce have particular emissions characteristics, whether individually or in the aggregate." *Id.* at 253 (citation and internal alteration omitted).  But the Court rejected this argument, reasoning in part that "[t]he language of [the CAA's preemption provision] is categorical.  It is . . . impossible to find in it an exception for standards imposed through purchase restrictions rather than directly upon manufacturers."  *Id.* at 256; *see also id.* at 255 (concluding that "treating sales restrictions and purchase

restrictions differently for pre-emption purposes" had "no basis in the text of the statute"). The Court ultimately "decline[d] to read into [the preemption provision] a purchase/sale distinction that is not to be found in the text of [the preemption provision] or the structure of the CAA." *Id.* at 255.

The TCA includes a fundamentally different preemption provision than either of the provisions considered by the Supreme Court in *National Meat* and *Engine Manufacturers*. Neither of the federal statutes in those cases sandwiched their preemption clause between preservation and savings clauses that explicitly and repeatedly reiterated local authority over product sales. Unlike the preemption provisions considered in those cases—which the Supreme Court characterized as "sweep[ing] widely" and "categorical"—the TCA's plain text distinguishes between tobacco product standards and state or local regulation of the final sale of tobacco products, preempting the former while allowing the latter. *National Meat* and *Engine Manufacturers* are inapposite and don't control this case. Rather than following precedent interpreting very different federal statutory language, we must instead be guided by the TCA's unique text, framework, and history.

### b. *Alternatively, the Savings Clause Saves the County's Sales Ban from Preemption.*

Even if we read "tobacco product standards" as broadly as Appellants urge and therefore concluded that the County's sales ban fell within the text of the TCA's preemption clause, the ban would still be "except[ed]" from preemption by the TCA's savings clause. A ban on the sale of flavored tobacco products is, simply put, a requirement that tobacco retailers or licensees throughout the County not sell flavored tobacco products. It therefore fits within the savings clause as a

"requirement[] relating to the sale . . . of[] tobacco products [to] individuals of any age."  21 U.S.C.A. § 387p(a)(2)(B).

Appellants nevertheless contend that the savings clause doesn't apply.  They first argue that the savings clause only saves sales *requirements*, not sales *prohibitions*, from preemption.  In support, they contrast the saving clause's omission of the phrase "or prohibiting" with the preservation clause's inclusion of that phrase.  *Compare id.* § 387p(a)(2)(B) ("requirements *relating to the sale* . . . of[] tobacco products"), *with id.* § 387p(a)(1) ("requirements . . . relating to *or prohibiting* the sale . . . of tobacco products") (emphasis added).  To give meaning to both phases, Appellants argue, the saving clause's omission of the word "prohibiting" must mean that state and local governments can broadly impose sales "requirements," but must stop short of "prohibiting" the sale of any tobacco products.  Appellants conclude by claiming that a holding otherwise would render the preemption clause a "dead letter," by allowing states and localities the ability to indirectly regulate tobacco product standards by simply banning any disapproved products.

The problem with Appellants' argument is that the preemption clause also omits the word "prohibiting."  Like the savings clause, the preemption clause simply references "any requirement . . . relating to tobacco products standards."  *Id.* § 387p(a)(2)(A).  So if Appellants are correct that § 387p draws a sharp distinction between "prohibitions" versus mere "requirements relating to the sale . . . of[] tobacco products," then the plain text of the preemption clause itself doesn't preempt any tobacco product "prohibitions."  *See R.J. Reynolds Tobacco Co. v. City of Edina*, 482 F. Supp. 3d 875, 881-82 (D. Minn. 2020) (rejecting the same argument on similar rationale); *see also*

*U.S. Smokeless Tobacco Mfg. Co. v. City of New York*, No. 09-10511, 2011 WL 5569431, at *7 (S.D.N.Y. Nov. 15, 2011) (rejecting a similar argument and concluding that "as the Preemption Clause is itself silent regarding sales prohibitions, it seems far more likely that prohibitions are preserved and never preempted, and therefore need never be saved"), *aff'd*, 708 F.3d 428 (2d Cir. 2013).

Appellants attempt to avoid the textual import of their argument by parsing out the preemption clause's use of the word "any," such that the preemption clause's reference to "*any* requirement . . . relating to tobacco products standards" means that it also includes prohibition-type requirements. But aside from injecting an enormous amount of hidden meaning into the word "any," this argument runs into the same problem as Appellants' "tobacco products standards" argument: if the preemption clause preempts all state and local regulations prohibiting the sale of tobacco products, then the preservation clause's preservation of those exact prohibitions is rendered entirely superfluous. Because "[w]e avoid statutory interpretations that render entire sections of the statute superfluous," *United States v. Leon H.*, 365 F.3d 750, 753 (9th Cir. 2004), we decline to assign different meanings to the preemption and saving's clause use of word "requirement."

Appellants' the-County-may-regulate-but-not-prohibit-sales argument would also create a hopelessly inadministrable standard. Appellants concede that "state and local governments retain their broad, traditional power to *regulate* the sale of tobacco products"—which would include "restrictions on where products may be sold (e.g., not near schools)"—but argue that the "one thing they cannot do is *prohibit* the sale of those products." But as other courts have observed, "it would be nearly impossible to

distinguish a permissible 'restriction' from an impermissible 'prohibition'" because "[n]early any regulation can be characterized as a 'prohibition,' including the . . . restrictions that [Appellants] contend are within the meaning of the word 'requirement.'" *City of Edina*, 482 F. Supp. 3d at 881 n.4. For example, a restriction on sales of tobacco products near schools, which Appellants concede is permissible, can easily be characterized as a prohibition of tobacco sales in a specified area (which, by way of banning such sales only throughout the County, is exactly what the County's sales ban does here). Or by way of another example, under Appellants' interpretation of the savings clause, a city could impose a 105-year-old minimum age "requirement" for purchases of flavored tobacco products, which would lead to effectively the same result as the County's sales ban. Because "prohibitions" can almost always be practically achieved by mere well-crafted partial "regulations," it makes little sense to interpret the savings clause as drawing the amorphous line that Appellants urge. "We must avoid an interpretation that would produce absurd results," *United States v. LKAV*, 712 F.3d 436, 444 (9th Cir. 2013) (citation and internal quotation marks omitted), and the better understanding is that Congress intended to allow the federal government the sole authority to set tobacco product standards, while retaining for states and localities their longstanding authority to say: "not here."

Nor is Appellants' "dead letter" argument persuasive. Even though the preemption clause does not preempt sales bans, it's hardly useless. It still preempts states from setting actual product standards. A state cannot *require* tobacco companies to make their products according to any particular standard—only the federal government can do that. But a state can place restrictions on the retail sale of a tobacco product, including banning its sale altogether. In other

words, as noted above, the balance of power struck by the TCA allows state and local governments to opt out of the market, but it doesn't allow them to otherwise set parameters for that market that conflict with the federal government's tobacco product standards. That is the "delicate balance" established by Congress in § 387p's unique preservation sandwich.

Appellants finally argue that the savings clause's reference to "individuals of any age" limits the scope of the clause to age-based requirements. But "[a]s other courts have noted, [Appellants]' interpretation turns the plain meaning of this phrase on its head." *City of Edina*, 482 F. Supp. 3d at 880. The actual text of the phrase reveals the opposite of Appellants' interpretation. "Of any age" suggests that state and local governments are not limited to enacting only age-based rules, but rather can enact regulations for people "of any age"—in other words, for everyone. *See U.S. Smokeless Tobacco Mfg. Co.*, 703 F. Supp. 2d at 345 ("Indeed, read literally, the saving clause does not relate to the sale or distribution of tobacco products to anyone at all—only *by* anyone—and that 'anyone' can be a person of any age.").

Appellants argue that this interpretation renders the phrase superfluous, but it actually clarifies that states and local governments are *not* limited to enacting regulations tied to certain age ranges. This makes sense given the TCA's framework and historical context, where the TCA preserved state, local, and tribal authority to enact regulations "in addition to, or more stringent than, requirements . . . relating to or prohibiting the sale . . . of tobacco products," 21 U.S.C. § 387p(a)(1), and where the federal government had previously attempted to assert jurisdiction over tobacco products to enact age-specific tobacco regulations. *See*

*Brown & Williamson Tobacco Corp.*, 529 U.S. at 125–26 (holding that FDA, which had promulgated regulations to reduce tobacco use among children and adolescents, lacked jurisdiction to regulate tobacco products).  In other words, the TCA expressly preserves local authority to enact *more* stringent requirements than the federal government, which had a history of attempting to target specific ages when enacting tobacco regulations.  Because the County banned the sale of flavored tobacco products to all individuals "of any age," the savings clause squarely applies.

Appellants' superfluity argument suffers from another flaw, which is that adding "individuals of any age" to pretty much any statutory text will in some respects always be superfluous.  For example, if a statute prohibits "driving cars without a license," adding "by individuals of any age" to the prohibition technically does nothing because nothing in the basic prohibition itself indicates it is age-limited.  But a legislature might add such "superfluous" language to the prohibition if it is concerned that something about the history of such prohibitions could tempt courts to read into the prohibition an *implicit* age restriction.  That best explains why § 387p repeatedly clarifies that the powers preserved to non-federal governments are *not* age-restricted, particularly since so much historic tobacco product regulation has involved age restrictions.

## 2.  The TCA Does Not Impliedly Preempt the Sales Ban.

Finally, the TCA also does not impliedly preempt the County's sales ban.  Appellants argue that the County's sales ban poses an obstacle to the FDA's current judgment that menthol cigarettes should remain on the market.  "[O]bstacle preemption occurs when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Chamber of Com. of United States*

*v. Bonta*, 13 F.4th 766, 774 (9th Cir. 2021) (citation and internal quotation marks omitted). With implied preemption, "we start with the assumption that the historic police powers of the States are not preempted unless that was the clear and manifest purpose of Congress." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020) (citation and internal quotation marks omitted). Courts also "give[] great weight to Congress' inclusion of a provision preserving states' enforcement authority." *Id*. at 1213.

Here, while the TCA permitted the FDA to enact future regulations upon making certain findings, *see* 21 U.S.C. § 387g(a)(3)(A)–(B), it did not mandate that certain tobacco flavors *must* remain available for sale. And while the TCA bans all cigarette flavors *except* menthol and tobacco, *id.* § 387g(a)(1)(A), it nowhere prohibits states from going further. To the contrary, as discussed above, the preservation clause explicitly allows states, localities, and tribal entities to enact regulations "more stringent than" the TCA's requirements—including regulations "relating to or prohibiting the sale . . . of tobacco products." *Id.* § 387p(a)(1). Given that the TCA does not mandate that certain flavors must remain available for sale, and expressly preserves local authority to enact sales regulations more stringent than the TCA, the County's sales ban does not "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" expressed in the TCA. *Chamber of Com. of United States*, 13 F.4th at 774 (citation omitted). It is therefore not impliedly preempted.

## V. CONCLUSION

For the reasons stated herein, the County of Los Angeles's ban on the sale of flavored tobacco products is

neither expressly nor impliedly preempted by the Tobacco Control Act.  The district court is **AFFIRMED**.[8]

---

R. NELSON, Circuit Judge, dissenting:

Twice we have been reversed for interpreting an express preemption clause to allow states and municipalities to defeat its entire purpose with a sales ban.  Still, the majority thinks that this time is different, in particular because this statute has a preservation clause and a savings clause.  But those clauses can't get the majority where it needs to go.  The Tobacco Control Act's (TCA's) preservation clause does not limit the preemption clause at all.  Instead, it clarifies that no other section of the statute (or regulation promulgated under it) has a preemptive effect and that federal agencies (including the armed forces) and Indian tribes are unaffected by the preemption clause.  And the savings clause only allows states to enact age bans.  Because Los Angeles's ban falls within the preemption clause and is neither preserved nor saved, I would hold that it is expressly preempted.[1]

I

In the last two decades, the Supreme Court has twice reversed us for failing to find California regulations expressly preempted.  *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246 (2004); *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452 (2012).  In *Engine Manufacturers*, Los Angeles's Air Quality Management District required

---

[8] We **GRANT** Appellees' unopposed request for judicial notice.

[1] I agree with the majority that there is no presumption against express preemption, and that the ban is not impliedly preempted.

public and private fleet operators to purchase cars which met certain emission specifications. *See* 541 U.S. at 248–49. The manufacturers sued and argued that the rule was preempted by the Clean Air Act, *see id.*, which says that states cannot adopt "standard[s] relating to the control of emissions from new motor vehicles," 42 U.S.C. § 7543(a).

Los Angeles argued that a "standard" was only "a production mandate" that required manufacturers to do certain things, and thus that its purchase requirement was not preempted because it was not a standard but a sales regulation. 541 U.S. at 254–55. The Supreme Court soundly rejected the argument, reasoning that "a standard is a standard even when not enforced through manufacturer-directed regulation." *Id*. at 254. Los Angeles's rule didn't regulate car manufacturers directly, but by banning the sale of cars made in some ways, it effectively forced manufacturers to make cars in certain other, state-approved ways. *Id.* Even though it did not regulate manufacturers directly, the Supreme Court held that it was a standard all the same. *Id*.

The Supreme Court built on this reasoning in *National Meat*, 565 U.S. at 452–68. In that case, California banned slaughterhouses from selling meat from animals that could no longer walk. *Id*. at 455. Meat manufacturers argued that the law was preempted by the Federal Meat Inspection Act (FMIA), which prohibits states from adopting "requirements within the scope of [the FMIA] with respect to premises, facilities and operations of any establishment at which inspection is provided under . . . [the FMIA] which are in addition to, or different than those made under [the FMIA]." *Id*. at 458; 21 U.S.C. § 678. California argued much Los Angeles had in *Engine Manufacturers*—that its rule only regulated sales, not manufacturing, and thus was not

preempted.  *Nat'l Meat*, 565 U.S. at 463.  The Supreme Court again soundly rejected the argument.

Rather than read it as just an "incentive" or "motivator," as California had asked it to, the Court held that the sales ban "instead functions as a command to slaughterhouses to structure their operations in the exact way" provided for by the law.  *Id*. at 463–64.  The Court further reasoned that if a ban like this were not preempted, then "any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved," which "would make a mockery of the FMIA's preemption provision."  *Id*. at 464.

Of course, these cases and this case each deal with a different express preemption provision.  But the import of *Engine Manufacturers* and *National Meat* is clear.  When Congress expressly preempts state regulation, states can't get around Congress's prohibition by disguising that type of regulation as a sales ban.

## II

*Engine Manufacturers* and *National Meat* require us to hold that Los Angeles's ban is covered by the preemption clause.  Still, the majority, relying on the TCA's preservation clause and savings clause, holds that this case is different.  It is not.  I first explain why the ban is covered by the preemption clause, and then explain why the ban is neither preserved nor saved.

## A

The TCA's preemption clause provides that "[n]o State or political subdivision of a State may establish or continue in effect with respect to a tobacco product any requirement

which is different from, or in addition to, any requirement under the provisions of [the TCA] relating to tobacco product standards." 21 U.S.C. § 387p(a)(2)(A). Whether Los Angeles's ban is preempted thus depends on whether it is a requirement different from or in addition to any TCA requirement relating to tobacco product standards. It is, and the statute itself shows why.

The TCA provides that no cigarette shall have any "artificial or natural flavor (other than tobacco or menthol)." *Id*. § 387g(a)(1). In the same section, the statute then calls this requirement a "tobacco product standard." *Id*. § 387g(a)(2). Congress has spoken: Cigarettes cannot have any flavors except tobacco and menthol, and that requirement is a tobacco product standard. In other words, a flavor ban is a tobacco product standard.

Los Angeles's sales ban is also a ban aimed at flavors, but it operates at the point of sale, rather than at the manufacturing stage. So, if Los Angeles's ban is not a tobacco product standard, it must be because tobacco product standards can relate only to manufacturing, and not to sales.

The problem for Los Angeles is that the Supreme Court has already rejected that argument. *See Engine Mfrs*., 541 U.S at 254. The majority holds that tobacco product standards are only about what can happen at the manufacturing process, not afterwards. But that's exactly the argument that the Supreme Court has twice rejected. Of course, the statute in *Engine Manufacturers* was not the TCA. But it used the same term—"standard"—and just like the statute at issue there, nothing in the TCA expressly limits tobacco product standards to manufacturing.

So tobacco product standards can be aimed at the manufacturing stage or the sales stage. The TCA itself contains a flavor ban aimed at the manufacturing stage and calls it a tobacco product standard. That flavor ban is a tobacco product standard, so Los Angeles's ban of sales of certain flavors must be a tobacco product standard, too.

Since Los Angeles's ban is itself a tobacco product standard, the only remaining question is whether Los Angeles's ban is a requirement with respect to a tobacco product "which is different from, or in addition to, any requirement under the provisions of [the TCA] relating to tobacco product standards." 21 U.S.C. § 387p(a)(2)(A). It is.

There's no dispute that Los Angeles's ban is different from or in addition to the TCA's flavor ban. And the TCA's flavor ban is related to tobacco product standards, because it is one. So our inquiry is limited to whether Los Angeles's ban and the TCA's tobacco product standard are "requirements." I would hold that they are, for three reasons. First, the majority and Los Angeles both concede that the sales ban is a requirement, for the purpose of the savings clause, and I agree with the majority that the word should keep the same meaning across different subsections. Second, it would be incongruous to read the preemption clause to cover all requirements relating in any way to tobacco product standards, but then not to cover tobacco product standards themselves. And third, *National Meat* itself held that a sales ban can be a preempted requirement. 565 U.S. at 459–64.

Several other courts have interpreted these provisions of the TCA. None of them have adopted the majority's reading. The majority reasons that it is "not alone" because the Second Circuit adopted a similar analysis. Majority at 21–

22; s*ee U.S. Smokeless Tobacco Mfg. Co. v. City of New York*, 708 F.3d 428, 434 (2d Cir. 2013). But the Second Circuit upheld a more limited regulation that still allowed sales of flavored tobacco, and just required that they take place in tobacco bars. *Id*. at 431. That court did adopt a version of the majority's sales vs. manufacturing distinction, but in doing so, it was careful to avoid implying that a complete sales ban would be permissible. *Id*. at 436. I agree with the *Smokeless Tobacco* court that a regulation of how sales may take place is not a tobacco product standard. But a flavor ban remains a preempted tobacco product standard even if it operates at the point of sale. And the *Edina* court forcefully rejected the majority's analysis, reasoning that courts adopting the manufacturing vs. sales distinction had "provided little in the way of justification" and even sometimes "little more than ipse dixit." *R.J. Reynolds Tobacco Co. v. City of Edina*, 482 F. Supp. 3d 875, 878 (D. Minn. 2020). I agree.

## B

In reaching the opposite conclusion, distinguishing *Engine Manufacturers* and *National Meat*, and holding that Los Angeles's ban is not covered by the preemption clause, the majority first relies heavily on the preservation clause. But the majority ignores the plain language of that clause. By its terms, the preservation clause does not apply to the preemption clause at all. Instead, it has three separate functions, none of which affect the preemption clause.

First, the preservation clause begins with the words "[e]xcept as provided in paragraph (2)(A)," which is the preemption clause. The preservation clause then preserves state authority from all sections elsewhere in the TCA. The preemption clause has no qualifier. Because it is qualified by the preemption clause, the preservation clause preserves

nothing that falls within the preemption clause; it is a command that other sections of the TCA do not have any preemptive effect.

Second, unlike the other two clauses, the preservation clause also refers to "rules promulgated under the [TCA]." 21 U.S.C. § 387p(a)(1).  The second function of the preservation clause is to prohibit regulations from having any preemptive effect.

Third, unlike the preemption and savings clauses, the preservation clause applies not just to states and political subdivisions of states, but also to federal agencies (including the armed forces) and the governments of Indian tribes. Because the preemption and savings clauses apply only to states and political subdivisions, the preservation clause thus clarifies that federal agencies and Indian tribes are not preempted from doing anything at all.

The majority declines to adopt my reading of the preemption clause, arguing that it would make the preservation clause "a nullity."  Majority at 20.  But my interpretation does no such thing.  The preservation clause has three important functions: It "clears the field" for the preemption clause by clarifying that neither other sections of the TCA nor regulations pursuant to the TCA can have a preemptive effect, and it applies to federal agencies and the governments of Indian tribes.  My reading of the preemption clause does not disturb these functions.

## C

Having dealt with the preservation clause, the majority's argument now hangs just on the savings clause.  While a closer call than the preservation clause, the savings clause can't bear the majority's argument either.

The savings clause saves from preemption "requirements relating to the sale, distribution, possession, information reporting to the State, exposure to, access to, the advertising and promotion of, or use of, tobacco products by individuals of any age." 21 U.S.C. § 387p(a)(2)(B). The question is thus whether Los Angeles's ban is a "requirement[] relating to the sale . . . of tobacco products [to] individuals of any age." *Id*.[2] I would hold that it is not. The savings clause only saves for states the authority to enact age requirements. Any other reading makes the clause "[to] individuals of any age" superfluous.

First, "a statute should not be construed so as to render any of its provisions mere surplusage." *United States v. Wenner*, 351 F.3d 969, 975 (9th Cir. 2003). But that's exactly how the majority construes the TCA here. If "[to] individuals of any age" allows any kind of ban, then Congress should have just left the entire phrase out, because it adds nothing. The savings clause would read just as well without the phrase: it would cover, in relevant part, "requirements relating to the sale of[] tobacco products." 21 U.S.C. § 387p(a)(2)(B) (altered to omit "by individuals of any age"). Plus, if Congress intended to allow any kind of ban, and if Los Angeles's reading is right, then Congress also might as well have said, "by individuals of any hair color" or "by individuals of any religious persuasion." Los Angeles's reading is thus not permitted.

Second, that "of any age" refers to age bans is supported by the statutory context. One of Congress's main priorities in passing the TCA was addressing underage smoking. *See*

---

[2] I agree with the majority that the clause covers requirements relating to the sale of tobacco products "to" people of any age, and not "by" people of any age. Majority at 12 n.5.

Tobacco Control Act, Pub. L. No. 111-31, Div. A, § 2, 123 Stat. 1,781 (2009) (codified at 21 U.S.C. § 387). But in 2009, many states already had laws restricting tobacco sales to young adults, not just minors. *See, e.g.*, S.B. 300, 1997 Sen., Reg. Sess. (Ala. 1997) (nineteen years old). Congress was concerned about underage smoking and did not want to block the states' efforts to address smoking by young adults. So when Congress preempted some tobacco regulation, it made sure to continue to allow states to set any age restrictions, to avoid interfering with states' efforts to combat smoking among young people generally.

On "of any age," the Second and First Circuits adopted the majority's reading, but their reasoning was not convincing. In *Smokeless Tobacco*, when quoting the TCA's savings clause, the Second Circuit just left off the "by individuals of any age" language entirely. *See* 708 F.3d at 435. The First Circuit did the same in *National Association of Tobacco Outlets, Inc. v. City of Providence*, 731 F.3d 71, 82 (1st Cir. 2013).

The district court in *Edina*, on the other hand, addressed the argument in depth. *See* 482 F. Supp. 3d at 880–81. But contrary to its holding ("of any age" allows any ban), its reasoning supports the opposite outcome. The *Edina* court pointed first to the "broader context of the Act," reflecting that the FDA had tried before to enact age restrictions, and second to the "congressional findings memorialized in the Act, which highlight the problem of tobacco use by children and adolescents." *Id.* The court reasoned that "[a]gainst this backdrop, Congress would have reason to emphasize that, although the Act grew out of concerns over tobacco use by minors, state and local governments are not limited to enacting age-related restrictions." *Id.* at 881. In support of this point, the court cited the district court's opinion in

*Smokeless Tobacco*, which held that the TCA's "reference to 'individuals of any age' was Congress'[] way of saying that the carve-outs for state prerogative would not be limited to enacting laws aimed only at minors." 482 F. Supp. 3d at 881 (citing 703 F. Supp. 2d 329, 348 (S.D.N.Y. 2010)).

I agree with this reasoning, but it supports the opposite conclusion. The S.D.N.Y. had it exactly right: Congress wasn't limited to saving laws aimed just at minors. Rather, it saved age bans aimed at individuals *of any age*—minors or adults. That's why Congress included the phrase "individuals of any age." Congress was focused on smoking by young people and some states already banned cigarette sales to young adults. These are reasons to think that Congress was trying to save only age bans, not other bans.

The majority avoids my interpretation by arguing that it leads to an absurd result—that states cannot ban flavored tobacco products but can simply set a minimum age of 105. But an age ban with a minimum age of 105 is not really an age ban; it is, in effect, a blanket ban. Courts are well-equipped to tell the difference between a real age ban and a purported age ban that is really a de facto ban. That the line might be hard to draw in some hypothetical future case is no reason to throw the baby out with the bathwater. We must avoid reading statutes in absurd ways, *United States v. LKAV*, 712 F.3d 436, 444 (9th Cir. 2013) (citation and internal quotation marks omitted), but no canon of statutory interpretation requires us to avoid any reading of a statute under which one can craft an absurd argument.

III

To sum up, first, the preservation clause does not affect the preemption clause. Instead, it clarifies that no other provision of the statute (or regulation made under it) has any

preemptive effect. It also clarifies that the authorities of federal agencies and Indian tribes are not preempted by the TCA. Second, the preemption clause preempts all requirements different from or in addition to the TCA's requirements relating to tobacco product standards. That includes Los Angeles's ban, which is itself a tobacco product standard enforced at the point of sale. And third, the savings clause only permits states and municipalities to enact age bans. Los Angeles's ban is thus preempted.

The majority reads these three clauses as a "preservation sandwich served up by the TCA." Majority at 25. But in holding that Los Angeles's ban is not preempted, the majority has actually folded itself into a pretzel. The majority argues that the preemption clause is "hardly useless," because the federal government is still the only one that can technically set standards. Majority at 30–31. But under the majority's reading, states and municipalities can ban anything made with standards that they don't like, and thus can "opt out of [the federal standards]" entirely. *Id*. This is the very reasoning that the Supreme Court says "make[s] a mockery" of a preemption clause. *Nat'l Meat*, 565 U.S. at 464. By construing the TCA's preemption clause to allow sales bans that defeat its entire purpose, the majority does just that.

I would hold that Los Angeles's ban is preempted by the TCA. I thus respectfully dissent.