# United States Court of Appeals

## For the Eighth Circuit

_____

No. 20-2852

_____

R. J. Reynolds Tobacco Company; R.J. Reynolds Vapor Company; American Snuff Company, LLC; Santa Fe Natural Tobacco Company, Inc.; Cousins II, Inc., doing business as Vernon BP; Lang's Automotive Service, Inc., doing business as Lang's One Stop Market

*Plaintiffs - Appellants*

v.

City of Edina; Edina City Council; Scott Neal, in his official capacity as City Manager of the City of Edina

*Defendants - Appellees*

------------------------------

Public Health Law Center; Action on Smoking and Health; African American Tobacco Control Leadership Council; American Cancer Society Action Network; American Heart Association; American Lung Association; American Medical Association; American Public Health Association; American Thoracic Society; Americans for Nonsmokers' Rights; Asian Pacific Partners for Empowerment, Advocacy and Leadership; Association for Nonsmokers-Minnesota; Blue Cross and Blue Shield of Minnesota; Campaign for Tobacco-Free Kids; Center for Black Health and Equity; ChangeLab Solutions; ClearWay; Massachusetts Association of Health Boards; Minnesota Medical Association; National LGBT Cancer Network; National Native Network; Parents Against Vaping e-cigarettes; Public Health Advocacy Institute; Public Health and Tobacco Policy Center; Truth Initiative

*Amici on Behalf of Appellee(s)*

_____

Submitted: May 12, 2021
Filed: February 27, 2023
[Published]
_____

Before COLLOTON, WOLLMAN, and KOBES, Circuit Judges.
_____

PER CURIAM.

The City of Edina, Minnesota passed an ordinance banning the sale of flavored tobacco products. R.J. Reynolds Tobacco Company sued the City, arguing that the Ordinance is preempted by the Family Smoking Prevention and Tobacco Control Act. The district court[1] granted the City's motion to dismiss, and Reynolds appealed. We conclude the Ordinance is not preempted and affirm the district court.

I.

In response to growing concerns about adolescent tobacco use, Congress passed the TCA in June 2009. Pub. L. No. 111-31, § 2(6), 123 Stat. 1776, 1777 (2009). One of the primary goals was to authorize "the Food and Drug Administration to set national standards controlling the manufacture of tobacco products." Id. § 3(3). To achieve national uniformity while still respecting States' police power, the Act has three sections relating to preemption: the Preservation Clause, the Preemption Clause, and the Savings Clause. Those three provisions are at the heart of this litigation.

---

[1]The Honorable Patrick Schiltz, now Chief Judge, United States District Court for the District of Minnesota.

First is the Preservation Clause: "[e]xcept as provided in [the Preemption Clause], nothing in [the TCA] . . . shall be construed to limit the authority of . . . a State or political subdivision of a State" to enact any law relating to tobacco "that is in addition to, or more stringent than" the requirements of the TCA. 21 U.S.C. § 387p(a)(1). Essentially, the Preservation Clause tells us that there is no "field preemption" for the TCA—states and cities are free to go above and beyond the requirements of the TCA to curb tobacco use.

The Preemption Clause limits that general principle. It says that states and cities cannot create any rule "which is different from, or in addition to" the TCA's requirements "relating to tobacco product standards" and tobacco "adulteration." Id. § 387p(a)(2)(A). So if the Preservation Clause is a general rule that cities can regulate beyond the TCA, the Preemption Clause carves out a few areas where they cannot regulate beyond the TCA. Under the Preemption Clause, cities are not allowed to have their own unique requirements for tobacco product standards.

The Savings Clause then qualifies the Preemption Clause's scope: "[s]ubparagraph (A) [the Preemption Clause] does not apply to requirements relating to the sale, distribution, . . . or use of, tobacco products by individuals of any age." Id. § 387p(a)(2)(B). The Savings Clause plainly operates to alter the meaning or application of the other two clauses, but the parties dispute its exact effects.

In 2020, the City of Edina passed Ordinance No. 2020-08. The Ordinance says that "[n]o person shall sell, offer for sale, or otherwise distribute any flavored tobacco products."[2] Edina, Minn., Code of Ordinances § 12-257. Reynolds, a

_____

[2]"Flavored tobacco products" are defined as:

[A]ny tobacco, tobacco-related product, or tobacco-related device that contains a taste or smell, other than the taste or smell of tobacco, that is distinguishable by an ordinary consumer either prior to or during consumption or use of the product or device, including, but not limited to, any taste or smell relating to menthol, mint, wintergreen, chocolate,

tobacco company that operates in Edina, sued for declaratory and injunctive relief. It argued that the TCA expressly and impliedly preempted the Ordinance.

The district court held for the City, granting its motion to dismiss. While the court agreed with Reynolds that the Ordinance fell within the Preemption Clause, it concluded that it was still allowed under the Savings Clause. The Ordinance, the court reasoned, relates to both a "tobacco product standard" and to a "requirement relating to the sale" of tobacco products. So, while the Ordinance was preempted, it was nevertheless rescued by the Savings Clause. Reynolds appealed.

II.

We review the grant of a motion to dismiss *de novo*. Grand River Enters. Six Nations, Ltd. v. Beebe, 574 F.3d 929, 935 (8th Cir. 2009). Likewise, preemption requires *de novo* review. Nat'l Bank of Com. v. Dow Chem. Co., 165 F.3d 602, 607 (8th Cir. 1999). "State action may be foreclosed by express language in a congressional enactment, by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or by implication because of a conflict with a congressional enactment," i.e., express, field, or conflict preemption. Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 541 (2001) (internal citations omitted). As the party asserting federal preemption of state law, Reynolds bears the burden of showing that the TCA preempts the Ordinance. Williams v. Nat'l Football League, 582 F.3d 863, 880 (8th Cir. 2009).

---

cocoa, vanilla, honey, fruit, or any candy, dessert, alcoholic beverage, herb or spice. A public statement or claim, whether express or implied, made or disseminated by a manufacturer of the product or device, or by any person authorized or permitted by the manufacturer to make or disseminate public statements concerning such products, that a product has or produces a taste or smell other than tobacco will constitute presumptive evidence that the product is a flavored tobacco product.

Edina, Minn., Code of Ordinances § 12-189.

A.

First, we must decide whether the Ordinance triggers the Preemption Clause. The City argues that it does not because the Ordinance is simply a ban on sales, not a "tobacco product standard." The Ordinance does not tell tobacco companies how to manufacture tobacco or what additives they can include in tobacco. All it does, the City argues, is ban the sale of flavored tobacco.

This argument has worked elsewhere, and we are similarly convinced. In U.S. Smokeless Tobacco Manufacturing Co. v. City of New York, the Second Circuit held that a similar ban was not a "tobacco product standard." 708 F.3d 428, 435 (2d Cir. 2013). The court reasoned that not "every sales ban—many of which would likely have some effect on manufacturers' production decisions—should be regarded as a backdoor requirement relating to tobacco product standards that is preempted." Id. at 434 (citation omitted) (cleaned up). To be a "tobacco product standard," the court held, a "regulation must be something more than an incentive or motivator; it must require manufacturers to alter the construction [or] components . . . of their products." Id. (citations omitted) (cleaned up). The First Circuit has held similarly, see Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence, 731 F.3d 71, 82–83 & n.11 (1st Cir. 2013) (holding that sales regulations were not tobacco product standards), and we agree.

Alternatively, if we assume for the sake of analysis that the Ordinance does constitute a tobacco product standard, then we must consider whether the Ordinance is rescued by the Savings Clause. To answer that, we must decide what role the Savings Clause plays in the TCA's preservation and preemption scheme. The Savings Clause begins, "[s]ubparagraph (A) [the Preemption Clause] does not apply to requirements relating to the sale" of tobacco. 21 U.S.C. § 387p(a)(2)(B). The central issue in this case is figuring out what effect "does not apply" has on the scope of the Preemption Clause.

There are two theories on this issue.  The first is that "does not apply" means that if something falls under the Savings Clause, it cannot also fall under the Preemption Clause.  This would act as a clarification to the Preemption Clause, rather than as a freestanding shield to preemption.  A state rule either goes into the Preemption "bucket" or the Savings "bucket"—but not both.  In this approach our task would be to determine where the Ordinance fits better:  the Preemption Clause or the Savings Clause.  In other words, is the Ordinance more of a requirement "relating to tobacco product standards," or is it better characterized as "a requirement relating to the sale" of tobacco?  Because the Ordinance mostly operates to regulate the presence of flavoring in tobacco products, it is better characterized as "relating to tobacco product standards."  The Ordinance would then fall into the Preemption "bucket" and be preempted by the TCA's rule governing tobacco flavor.

The second theory is that "does not apply" means the Savings Clause voids the effect of the Preemption Clause.  That is, if a rule falls into the Preemption Clause "bucket" but also relates to sales, it is essentially scooped out of the Preemption Clause bucket and placed into the Savings Clause bucket.  This would act as an exception to the Preemption Clause, working to rescue a subset of state rules the TCA otherwise preempts.  Under this approach the Ordinance escapes preemption because, as a sales restriction, it is a requirement "relating to the sale" of tobacco.

We are presented with two plausible readings of the Savings Clause that compel two different outcomes.  Applying the descriptive canons does not provide further clarity.  Both readings risk rendering other terms of the statute superfluous.  As the Supreme Court noted in Engine Manufacturers Ass'n v. South Coast Air Quality Management District, a manufacturer's ability to sell a product is meaningless in the absence of a purchaser's ability to buy it.  541 U.S. 246, 255 (2004).  Reading the Savings Clause as an exception to the Preemption Clause risks making the TCA's preemption of tobacco manufacturing standards meaningless, because States could effectively regulate manufacturing so long as they couch it in terms of sales.  Similarly, reading the Savings Clause as a clarification to the Preemption Clause results in stripping any independent effect it might have on a

preemption analysis, because the Savings Clause would not apply to any rules not already preserved by merit of falling outside the Preemption Clause's purview.  This risks rendering the Savings and Preservation Clauses synonymous and collapsing any distinction between them.

Further, both readings promote the TCA's purposes.  The TCA's "stated purposes include, on the one hand, reducing the use of, dependence on, and social costs associated with tobacco products and, on the other, allowing the continued sale of such products to adults 'in conjunction with measures to ensure that they are not sold or accessible to underage purchasers.'"  Smokeless Tobacco, 708 F.3d at 433 (quoting TCA § 3(7), codified at 21 U.S.C. § 387).  Reading the Savings Clause as a clarification would limit state regulatory authority but serve the TCA's purpose of ensuring reliable access to tobacco products for adult tobacco users.  Likewise, reading the Savings Clause as an exception gives States more expansive authority to tailor effective regulations for their communities, serving the purpose of reducing tobacco use, dependence, and social costs.

Our traditional understanding of federalism resolves this issue.  When addressing express or implied preemption we begin "with the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  Altria Grp., Inc. v. Good, 555 U.S. 70, 77 (2008) (cleaned up) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).  This assumption is especially important when Congress legislates in a field traditionally occupied by the States.  Id.  As a result, "when the text of a pre-emption clause is susceptible of more than one plausible reading," we must "accept the reading that disfavors pre-emption."  Id. (quoting Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449 (2005)).

The TCA involves the States' traditional police powers.  State governments historically possess police power to protect public health and safety.  See U.S. Const. amend. X.  States traditionally used this power to enact bans on selling tobacco products "for the preservation of the public health or safety."  Austin v. Tennessee,

179 U.S. 343, 349 (1900). Since the early 1900s, state and local authorities have enacted public health measures directed at the dangers of tobacco use. See Graham v. R.J. Reynolds Tobacco Co., 857 F.3d 1169, 1190–91 (11th Cir. 2017); Paul A. Diller, Why Do Cities Innovate in Public Health? Implications of Scale and Structure, 91 Wash. U. L. Rev. 1219, 1234–35 (2014) (discussing state and local bans of flavored cigarettes passed before the Tobacco Control Act banned cigarette flavorings). And here the record shows that the City's public health officials proposed this ordinance specifically to combat the health crisis of its youth using flavored vaping products.

Because the TCA is ambiguous and implicates traditional state police powers, we must accept the reading of the Savings Clause that disfavors preemption. See Altria Grp., 555 U.S. at 77. Of the two plausible interpretations outlined above, the City's reading best limits preemption and preserves traditional state authority. Absent clearer intent from Congress, we must accept the City's interpretation. See id. And, when read as an exception, the Savings Clause allows the Ordinance because it relates to the sale of tobacco products.

Even accepting this reading, Reynolds argues that the TCA preempts this "blanket prohibition" on the sale of a tobacco product. Reynolds argues that an outright ban on tobacco sales is not a "requirement[] relating to the sale" because it simply forbids sales rather than imposing regulatory rules or guidelines. Reynolds distinguishes the text of the Preservation Clause, which encompasses requirements "related to or prohibiting the sale," from the language of the Savings Clause, which only applies to requirements "relating to the sale." Reynolds argues that the inclusion of "prohibiting" into the Preservation Clause but not the Savings Clause means that blanket prohibitions of a product are not allowed.

But Reynolds identifies no basis in the text of the TCA to distinguish between a "blanket" prohibition and some prohibition relating to sale, like restrictions on sale to a certain age group or time, place, and manner restrictions. Further, as the district court noted, the argument

-8-

ignores the fact that the preemption clause, like the saving clause, uses the term "requirement" and does not explicitly refer to prohibitions. "Requirement" must mean the same thing in the two clauses. If a prohibition is a "requirement"—and if the Ordinance is a prohibition—then the Ordinance is preempted under the preemption clause (because, as the [Supreme] Court has held, the Ordinance relates to tobacco-product standards), but it is saved by the saving clause (because it relates to the sale of tobacco products). If a prohibition is not a "requirement"—and if the Ordinance is a prohibition—then the Ordinance is not preempted under the preemption clause and the saving clause is irrelevant. Either way, the Ordinance is not expressly preempted.

R.J. Reynolds Tobacco Co. v. City of Edina, 482 F. Supp. 3d 875, 882 (D. Minn. 2020). And even if Reynolds's reading is plausible, we are still required to accept the one that disfavors preemption. See Altria Grp., 555 U.S. at 77.

No matter how Reynolds tries to frame this case, the end result is the same. A plausible reading of the TCA allows state prohibitions, even "blanket" prohibitions, on the sale of flavored tobacco products. And because the TCA implicates state police powers, we must accept the interpretation that disfavors preemption. If Congress wants to preempt these types of state rules, it should do so more clearly. We conclude that the TCA does not expressly preempt the Ordinance.

B.

Finally, Reynolds argues that the TCA impliedly preempts the Ordinance because it "actually conflicts with federal law" and "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," i.e., conflict preemption. Conflict preemption doctrine preempts a state law if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)

(citation omitted). Whether conflict preemption applies "is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000). But the "[i]mplied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law." Chamber of Com. of U.S. v. Whiting, 563 U.S. 582, 607 (2011) (citation omitted). Reynolds bears the burden to show that conflict preemption applies. See Paris Limousine of Okla., LLC v. Exec. Coach Builders, Inc., 867 F.3d 871, 874 (8th Cir. 2017). And because the TCA implicates the States' traditional use of its police power, we must assume that the TCA does not preempt that authority unless it was the "clear and manifest purpose of Congress." See Altria Grp., 555 U.S. at 77.

Specifically, Reynolds suggests that the Ordinance would "prevent [the] FDA from executing its statutorily prescribed functions and upend the TCA's carefully calibrated regulatory scheme." In support, it points to a host of instances where the FDA refrained from banning the manufacture of all flavored tobacco products. But this argument is fundamentally flawed. First, conflict preemption requires the state law to stand in the way of the objectives of Congress, not the FDA. As the district court noted, "the decision of a federal agency not to issue a nationwide regulation is not the same thing as a decision by Congress (or even by that agency) that state and local governments should not be able to regulate." R.J. Reynolds, 482 F. Supp. 3d at 884 (emphasis omitted). No decision of the FDA indicates a decision of Congress that flavored tobacco products must remain on the market nationwide. Although the FDA certainly has the authority to remove tobacco products from the national market, Reynolds does not identify what "statutorily prescribed function" of the FDA allows it to determine which products must be sold.

Further, the Ordinance does not destroy Congress's regulatory scheme. Although the TCA does grant the FDA exclusive authority to promulgate tobacco manufacturing standards, Section 387p can be plausibly interpreted as preserving

state laws that relate to manufacturing, so long as they also relate to the sale of tobacco. See discussion supra Part II.A. Under that reading of the statute, the Ordinance does not "upend the TCA's carefully calibrated regulatory scheme"—it operates within it.

Contrary to Reynolds's belief, it is not clear that Congress's objective was to give tobacco companies an unqualified right to sell each and every tobacco product not banned on a federal level. Nothing in the text of the statute supports that claim. And while Congress intended to "continue to permit the sale of tobacco products to adults," TCA § 3(7), the findings section of the Act is replete with Congress's concerns about tobacco use, TCA § 2. According to Congress, "[t]obacco use is the foremost preventable cause of premature death in America," "inherently dangerous," and "Federal and State governments have lacked the . . . resources to comprehensively address public health and societal problems caused by the use of tobacco products." TCA §§ 2(13) (first quotation), 2(2) (second quotation), 2(7) (third quotation). In other words, Congress thought smoking kills. Against this backdrop, it enacted § 387p, expressly preserving state authority to regulate sales of tobacco products. This cuts heavily against the notion that Congress wanted to require states to allow the sale of certain tobacco products. On the record before us, we cannot conclude that the Ordinance conflicts with or imposes an obstacle to Congress's purpose and objectives in enacting the TCA. Therefore, it is not impliedly preempted.

## III.

The Tobacco Control Act does not expressly or impliedly preempt Edina's prohibitions on selling flavored tobacco. Because the Ordinance is not preempted, we affirm.

_____